**Pamela Helen WRIGHT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–97–01414–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

June 11, 1998.

Frank Pisano, Houston, for Appellant.

John B. Holmes, William Delmore, III, Houston, for Appellee.

Before O'CONNOR, TAFT and SMITH, JJ.*

## OPINION

O'CONNOR, Justice.

Pamela Helen Wright, the appellant, contends the trial court violated her constitutional right to bail by setting bail at $500,000, because no bail bondsman in Harris County is approved for making a bond in that amount. We affirm.

The appellant stands indicted in two criminal felony cases: (1) case number 761141 ("the murder case") and (2) case number 766109 ("the assault case"). In the murder case, the appellant is charged with using a firearm to cause the death of Danny Lee Crosby on August 16, 1997.[1] The appellant was arrested for the murder on August 16 and released on August 20, when she posted a $30,000 bond. The appellant was indicted in the murder case on October 30, 1997.

In the assault case, the appellant is charged with aggravated assault of Richard Jackson on October 16, 1997. Bond was initially set in the assault case by the district attorney at "no bond." The appellant challenged the "no bond" status by filing a motion for a hearing to determine the legality of holding her without bond. Without conducting a hearing, the trial court set bond at $500,000. The appellant then filed a petition for writ of habeas corpus challenging the bail as excessive. The trial court granted the writ and conducted a hearing.

---

* The Honorable Jackson B. Smith, Jr, retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. Lynda Crosby filed a wrongful death suit against the appellant for causing Danny Lee Crosby's death. The petition in that suit referred to, "Defendant, Pamela Wright, f/k/a Paul Wright." That is the one of only two references in the record regarding the appellant's gender change. The suit seeks compensatory damages in the amount of $3,000,000 and punitive damages in the amount of $10,000,000.

## A. The Habeas Hearing

### 1. The State's evidence

The State introduced the following documents: the complaint and the indictment in the murder case, the $30,000 bail bond in that case, and the complaint and the indictment in the aggravated assault case. The State called no witnesses and offered no other evidence.

### 2. The appellant's evidence

#### a. The appellant

The appellant testified by affidavit that she is 45 years old, has resided in Harris County for 15 years, served in the Army three years, has not been convicted of a felony, and has one sister living in Alabama. She was the caregiver to her father who suffered with cancer of the larynx until he died in June 1997. The appellant has $45,000 in cash, and owns a car and part interest in her family home. She owns no stocks, bonds, or mutual funds. Her only source of income is her expected inheritance from her father's estate. She could raise sufficient funds to make a $50,000 bond.

#### b. The probate lawyer

Patrick Hoskins, a probate lawyer, testified by affidavit that the appellant could expect to receive assets not to exceed one-half of her father's estate, which approached one million dollars. Before incarceration, the appellant had custody of and occupied the family home and acreage at 603 North Peach, Tomball, Harris County, Texas. The estate was tied up in the probate proceedings. Hoskins stated that if the appellant were to flee the jurisdiction of the trial court, she would be fleeing the future distribution of her inheritance.

Hoskins testified that in September 1997, before and after the filing of a wrongful death suit by Lynda Crosby, the appellant called him a number of times, asking how she could legally protect her financial assets, including whether she should stuff her money in a gas can and bury it.

#### c. The appellant's dentist

Walter M. Jarrell, the appellant's dentist, testified by affidavit that he had treated her October 16, 1997. He said he was treating the appellant for a chronic abscess, and the treatment plan would take six to nine months to complete. This evidence was offered to show that the appellant had no plans to flee the jurisdiction of the court.

#### d. The bondsman

Ed Blackwood, owner of a bail bond company, who was subpoenaed to appear at the hearing, testified that his company had interviewed the appellant about her ability to post bond. He said the appellant only had $45,000 in cash and a car, worth about $15,000, that was available to the appellant to collateralize the bond; the largest bond he would write for her was $50,000. Blackwood testified the house in Tomball was worth approximately $250,000 but was tied up in the probate of the appellant's father's estate, along with approximately half a million dollars. In Blackwood's opinion, if the appellant fled the jurisdiction of the Court, she would be walking away from the expected inheritance of the Tomball house and the money.

Blackwood testified the appellant could not presently touch the assets in the estate, but that if he made the bond he could tie up the property in such a way as to complicate any distribution of the estate if the appellant were to flee the court's jurisdiction.

To make bonds in Harris County, Blackwood was required to be licensed, and, to be licensed, he was required to follow the rules of the Harris County Bail Bond Board. Blackwood testified he had signed a document saying he would abide by the Rules of the Harris County Bail Bond Board. Under Rule 1D of the Harris County Bail Bond Board "no licensee may make a single bond in excess of the amount the licensee has deposited with the Bail Bond Board."

Because of Rule 1D, Blackwood said no surety bondsmen could write a surety bond in Harris County for $500,000. He explained that under the rules of the Harris County Bail Bond Board, to write a $500,000 bond, a surety bondsman would have to have $500,000 on deposit with the Harris County Bail Bond Board and no bondsman had such an amount on deposit. Blackwood said he was the owner of one of the state's largest bond-

ing companies, and that the largest face amount of bond that he could write on a single bond was $100,000.

In a bill of exceptions offered by the appellant, Blackwood testified the customary bond for an aggravated assault case is $20,000.

### e. Official from sheriff's bail bond division

Sergeant Bruce Carr, supervisor of the Harris County Sheriff's Office Bail Bond Division and a member of the Harris County Bail Bond Board by proxy, who was subpoenaed, testified that he had responsibility for overseeing surety bond companies and cash bonds that are processed throughout all of Harris County. He testified no bail bond licensee would be allowed to make a single bond in excess of the amount that the licensee had on deposit with the Bail Bond Board. A person who wanted to receive a license to make surety bonds had to deposit at least $50,000 with the board and, to receive a license, such person would have to sign an agreement that they would abide by the rules of the Bail Bond Board. Carr stated that to make a $500,000 bond, a surety would have to have $500,000 posted with the Board. Carr said none of the currently licensed bond persons or agencies had $500,000 on deposit. He said a bond for $300,000 might be posted, but that surety bondsmen choose not to post amounts as high as $500,000.

### f. The complainant in the assault case

Richard Jackson, the complainant in the assault case, was subpoenaed to testify. He admitted he is currently on parole and within the last 10 years he has been convicted of burglary of a building and aggravated assault. Jackson testified the appellant called him on October 16, 1997, at the Tomball Car Wash to pick up her car and to "detail" it. When he returned the car, Jackson thought the appellant was drunk. The appellant, who was charged $199.98 for the "detailing," gave Jackson and his co-worker $400 each as a tip. She talked to them about getting her a birth certificate, driver's license, and social security card, in return for the car they had just returned, a motorcycle, and $40,000. Jackson did not think she was serious.

That evening, Jackson's roommate, L.C. Downing, recommended that Jackson tell the police about the conversation. Not wanting to get the appellant in trouble if she was not serious, Jackson decided to visit her, as she had asked him to, to determine if she was serious about the fake identification documents.

Jackson said his roommate drove him to the appellant's house about 9:00 p.m. that night. His roommate waited in the car while he went inside. Jackson said the appellant was highly intoxicated at that time. According to Jackson, the appellant held him at gunpoint with a .38 Special Revolver at his head for 25 minutes, during which time the appellant removed a bullet from the revolver and showed it to him. Jackson said the appellant threatened that if he did not get her a birth certificate, identification, and a social security card, she would kill him. Jackson testified the appellant pulled up her nightgown and said she was going to change her identity back into a man.[2] Jackson admitted he did not suffer any physical injury at the hands of the appellant.

Jackson testified the appellant told him she was planning to use the fake identity to leave the country. He testified he was afraid when the appellant had him at gunpoint and that she was serious about everything she said to him that night.

### g. The complainant's roommate

L.C. Downing, who was subpoenaed, admitted he is currently serving unadjudicated probation for aggravated assault. He confirmed much of Jackson's testimony about events leading up to the drive to the appellant's house. He testified he was Jackson's roommate, and he drove Jackson to the appellant's house the night Jackson was assaulted. Downing waited in the car when Jackson went inside; he said Jackson did not stay in the appellant's house long, perhaps 15 minutes. When Jackson came out of the appellant's house, he said she was crazy and that he was scared. Jackson told him that the appellant had told Jackson that she had shot her husband.

**2.** This was the second reference to the change of gender.

### h. Officer who arrested the appellant in assault case

Captain George Olin, Captain of the Tomball Police Department, who was subpoenaed, testified that he was familiar with the facts of the aggravated assault case filed against the appellant. Olin said the appellant was arrested in Tomball for the aggravated assault case when she came out of her house in her nightgown to get the paper on the morning of October 17, 1997. Olin stated that Jackson told him that the appellant was drinking on the day in question and that Jackson did not know if the appellant was joking about wanting a new identity. Olin testified that while the appellant was in his custody, the appellant wrote three checks to a newspaper reporter. Olin said Jackson told him that the appellant had indicated that she was attempting to get a new identity to flee the country. He believed what Jackson told him.

A weapon was not recovered in the aggravated assault case. When the police went out to the appellant's on the morning following the incident, she refused to give her consent for them to search the house.

### B. The Amount of the Bond

The appellant raises three arguments why the trial court abused its discretion in refusing to lower appellant's bail: (1) considering the future safety of the community under Code of Criminal Procedure article 17.15(5) denies the appellant her right to due process under the federal and state constitutions; (2) the rules of the Harris County Bail Bond Board have the practical effect of denying the appellant access to a bondsman who can make bail in the amount of $500,000, thereby denying her constitutional right to bail; and (3) refusing to lower bail in this case because it is disproportionate to bail reduced for more serious offenses.

There is no precise standard for reviewing bond settings on appeal, but a reviewing court is guided by TEX. CODE CRIM. P. art. 17.15 (1998). *Ex parte Pemberton*, 577

S.W.2d 266, 267 (Tex.Crim.App.1979). Article 17.15 provides:

The amount of bail to be required in any case is to be regulated by the court, judge, magistrate or officer taking the bail; they are to be governed in the exercise of this discretion by the Constitution and by the following rules:

1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.

2. The power to require bail is not to be so used as to make it an instrument of oppression.

3. The nature of the offense and the circumstances under which it was committed are to be considered.

4. The ability to make bail is to be regarded, and proof may be taken upon this point.

5. The future safety of a victim of the alleged offense and the community shall be considered.

*Id.*

■ The Texas Constitution provides all prisoners a right to bail before trial, with few exceptions. *See* TEX. CONST. art. I, §§11, 11a; *Queen v. State*, 842 S.W.2d 708, 710–11 (Tex.App.—Houston [1st Dist.] 1992, no pet.). A defendant may be denied bail only when: (1) the prisoner is charged with a capital offense and the proof of such offense is evident; (2) any of the exceptions embodied in article 1, section 11a applies; or (3) when other extraordinary circumstances are present. *Smith v. State*, 829 S.W.2d 885, 886–87 (Tex.App.—Houston [1st Dist.] 1992, no pet.). Section 11a states one of the exceptions to the general rule of right to bail as when a person is "accused of a felony less than capital in this State, committed while on bail for a prior felony for which he has been indicted. TEX. CONST. art. I, §11a(2). None of the exceptions apply in this case.[3]

■ It is the appellant's burden to show that bail is excessive. *Ex parte Rubac*, 611

3. The appellant was accused of committing an aggravated assault, a felony less than capital, on October 16, 1997. She was indicted on October 30, 1997, for the felony of murder. If the appel-

lant's murder indictment had been issued two weeks earlier, she could have been denied bail under the no bail provision of §11a(2).

S.W.2d 848, 849 (Tex.Crim.App.1981); *Ex parte Willman*, 695 S.W.2d 752, 754 (Tex. App.—Houston [1st Dist.] 1985, no pet.).

### 1. Future Safety of the Community

The appellant contends the trial court erred in considering the future safety of the community under Code of Criminal Procedure article 17.15(5) because it denied her right to due process under the federal and state constitutions.

■ Article 17.15(5) states the future safety of a victim of the alleged offense and the community "shall be considered." TEX. CODE CRIM. P. 17.15(5). When challenging the constitutionality of a statute, an appellant must show it is unconstitutional as applied to the appellant. *Cantu v. State*, 939 S.W.2d 627, 643 (Tex.Crim.App.1997). In the present case, no evidence was presented regarding the future safety of the community and the trial court did not state it relied upon this factor in refusing to lower bail. Under these circumstances, the appellant did not show article 17.15(5) is unconstitutional as applied to her.

### 2. Board Rule Denied Access to Bondsman

The appellant asserts the trial court erred in setting bail at $500,000 because under the Harris County Bail Bond Rule 1D, which provides "no licensee may make a single bond in excess of the amount the licensee has deposited with the Bail Bond Board," no bonding company in Harris County was able to post a bond of $500,000.

■ The issue of whether bail can be set above the amount that any bondsman is able to post is one of first impression. However, we see no reason not to treat the ability of a bail bondsman to post bond for the appellant as part of the general ability to make bail under article 17.15(4), like the issue of indigence. It is well settled that the ability of an accused to make bail does not itself control the amount of bail, even if the accused is indigent. *Ex parte Charlesworth*, 600 S.W.2d 316, 317 (Tex.Crim.App.1980); *Patterson v. State*, 841 S.W.2d 534, 535 (Tex.

App.—Houston [1st Dist.] 1992, pet. ref'd). Like indigency, the ability of a bail bondsman to post bond should not be a controlling factor for the fixing of bail by the trial court. Therefore, we decline to set an artificial cap on the amount a trial court can set as bail that is dependent on the ability or willingness of a bail bondsman to put up funds to write bonds in certain amounts.

### 3. Bail Amount is Disproportionate to the Offense

The appellant asserts the trial court erred in setting bail at $500,000 for the aggravated assault charge because it is disproportionately higher than the bail required for more serious offenses. By comparison, the appellant points to her bail for the murder charge, which was set at only $30,000. We disagree with the appellant's complaint.

■ The object of a bail bond is to secure the presence of the accused at trial, but where the accused has made threats that he will not be tried or is not disposed to regard the obligation of ordinary bonds, the fixing of a higher bond is justifiable. *See Ex parte Calloway*, 98 Tex.Crim. 347, 265 S.W. 699, 700 (1924) (defendant violated the terms of bonds by not appearing on date required and forfeited three separate bonds). In determining what constitutes reasonable bond, we consider the possible punishment [4] and the nature of the charged offense. *Holliman v. State*, 485 S.W.2d 912, 914 (Tex.Crim.App. 1972); *Ex parte Penagos*, 810 S.W.2d 796, 798–99 (Tex.App.—Houston [1st Dist.] 1991, no pet.). We also consider other circumstances and factors, including family ties, residence, the appellant's work history, criminal record, and any previous outstanding bonds. *Rubac*, 611 S.W.2d at 849–850; *Willman*, 695 S.W.2d at 754.

■ In this case, there are sufficient reasons to set higher bail for the assault charge than the bail for the murder charge because (1) the appellant attempted to obtain fake identification to flee the country, (2) the appellant committed the aggravated assault as part of a plan to escape punishment for

---

4. The range of punishment for aggravated assault is confinement in the penitentiary for not

more than 20 years or less than two years. TEX. PEN. CODE §§12.33, 22.02 (1998).

another, more serious charge, and (3) the appellant has funds to post a lower bond and is likely to obtain considerably more assets that she could use to accomplish her goal of fleeing the jurisdiction.[5]

■ The appellant refers the Court to cases where the accused was charged with the more serious offense of capital murder and the reviewing court reduced the bail to less than $500,000. None of those cases, however, involved a defendant who (1) planned to flee the jurisdiction and avoid capture by submitting to an operation to change gender identity and attempting to secure fake identity papers to leave the country, (2) held a person at gunpoint, threatening to kill him if he did not obtain the fake identity papers, (3) faces a charge for murder, having admitted shooting the victim, and (4) faces a wrongful death suit seeking $3,000,000 in compensatory damages and $10,000,000 in punitive damages. From this evidence, the trial judge could have reasonably concluded that the actions of the appellant, who had no family ties in the area and no job, and was faced with the prospect of incarceration for murder, demonstrated a substantial threat of fleeing the jurisdiction. Therefore, the trial court was justified in relying on the uncontradicted evidence that the appellant was planning to flee the jurisdiction as a reason to set a substantially higher bond than one normally required for aggravated assault. See Calloway, 265 S.W. at 700.

We hold that the trial court did not err in setting the appellant's bail at $500,000. We affirm the trial court's order denying appellant's request that bail be lowered.

JACKSON B. SMITH, Jr., Justice, dissenting (Assigned).

I respectfully dissent. The appellant is charged with aggravated assault and her bond is set at $500,000. Because the facts are set forth in the majority opinion, I see no necessity to reiterate them. The only basis

that I can see for affirming such a high amount for the bond is what the evidence shows the appellant said when she was in a drunken or "crazy" condition.

The majority appears to primarily base their affirmation of the $500,000 bond on the possibility that the appellant will flee from the jurisdiction of the court. This seems to ignore the drunken condition of the appellant when the statement and assault were made. Further, apparently little weight was given by the majority to the evidence that the appellant may inherit a substantial amount from her father's estate. If the appellant flees from this country, with all the criminal charges now pending against her, there is the possibility she would never obtain any of her inheritance. This should be a strong motivational force for the appellant to comply with the court's order.

Although there is no precise standard for reviewing bond settings on appeal, we do have certain guidelines set forth in the Texas Code of Criminal Procedure. See TEX. CODE CRIM. P. art. 17.15 (Vernon Supp.1998). Article 17.15 first instructs us that the "bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with." Except for the appellant's remarks while in a drunken condition there is no reason to believe that she would not comply with the court's order.

It is manifest that the $500,000 bond is not conforming with the usual bond amount set in aggravated assault cases. The district court judges in Harris County, Texas, who have been designated to handle criminal cases, have adopted "District Court Bail Schedule." Aggravated assault, as charged, is a second degree felony. See TEX. PEN. CODE § 22.02(b) (Vernon 1994). The suggested bond amount on that schedule for a second degree felony is $10,000. Granted, there are extenuating circumstances in this case, but 50 times the suggested bond amount appears to be excessive.

5. The dissent considers the appellant's inheritance as motivating the appellant to remain in this jurisdiction. The dissent reasons that the appellant might not be able to collect her inheritance if she were to flee the jurisdiction. We

disagree that inheritance would necessarily motivate her to stay. Ultimately, the appellant is facing a murder charge and a $13,000,000 wrongful death suit.

Second, article 17.15 tells us that bail should not be an "instrument of oppression." The evidence shows that the appellant's present financial condition is insufficient to pay the fee charge for a $500,000 bond. It is true that the appellant may inherit sufficient funds at some future date to make the bond, but such date is unknown to anyone. As far as I can tell from the record, no witness would even speculate as to when the appellant's inheritance might come about. Under these circumstances the $500,000 bond is an "instrument of oppression."

Article 17.15 also tells us that consideration should be given to the future safety of the victim and the community. There is no evidence whatsoever that the appellant is in any manner a threat to the community, now or in the future. As to the complainant's safety, the complainant is a convicted felon, for burglary and aggravated assault, now on parole. I see nothing in the record showing that his safety is in jeopardy.

Finally, I see no facts in this case that would require or justify a $500,000 bail bond. I believe the bond is an "instrument of oppression" and excessive. Based on the facts and nature of the offense, I would reduce the appellant's bond to $100,000.