

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-14-00433-CR

### EX PARTE THOMAS MICHAEL DIXON

On Appeal from the 140th District Court
Lubbock County, Texas
Trial Court No. 2012-435,942, Honorable Jim Bob Darnell, Presiding

March 6, 2015

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

This is an appeal from the denial of habeas corpus relief for bail reduction. An indictment charged appellant, Amarillo plastic surgeon Thomas Dixon, with the capital murder of Lubbock pathologist Joseph Sonnier, III. Dixon's bail was set at $10 million and he remained incarcerated for over two years pending trial. Dixon's three-week jury trial ended in a mistrial on November 20, 2014. On December 10, Dixon filed an application for writ of habeas corpus, seeking reduction in the amount of bail. The writ issued and a hearing was convened on December 17. After the hearing, the court signed an order denying Dixon the requested relief. Findings of fact and conclusions of

law were not requested or filed. Finding the record does not establish an abuse of discretion by the trial court, we will affirm its order.

## Background

Sonnier was murdered in his home on July 10, 2012. He was shot and stabbed. Under the State's theory of the case, the murder arose from Dixon's jealousy and anger over Sonnier's relationship with Richelle Shetina, with whom Dixon formerly had a relationship. The State contended Dixon was aware of his friend David Shepard's financial difficulties, and hired Shepard to kill Sonnier in exchange for three bars of silver.

Dixon and Shepard were arrested in July 2012. Shepard plead no contest to the charge of murdering Sonnier for remuneration and is serving a sentence of life without parole. In an October 2012 statement to police, Shepard said Dixon paid him three silver bars to kill Sonnier.

Shepard and Dixon testified at Dixon's trial. Dixon testified he believed Shepard killed Sonnier. His defense took the position Dixon was inculpated in the murder only by Shepard's October 2012 statement. The defense called Shepard a "con man." In his testimony, Shepard denied Dixon asked him to kill or harm Sonnier. He said Dixon gave him the bars of silver because of his financial difficulties. At times he referred to the bars as "a loan." Dixon testified the three silver bars were his investment in a health care business that Shepard, Dixon and a third man were forming.

Evidence showed Shepard made several trips to Lubbock before the murder. Dixon testified the two men planned for Shepard to photograph Sonnier in the company

2

of women other than Shetina.[1]  They eventually planned that Shepard would attempt to attach a camera to the fence at Sonnier's residence.  Dixon acknowledged he was bothered by Shetina's high opinion of Sonnier and her belief she was in a "committed relationship" with Sonnier.  He maintained, however, that his plans with Shepard never included doing harm to Sonnier.

The jury was instructed on the charged offense of capital murder and on lesser offenses, but was unable to reach a unanimous verdict.

At the habeas hearing, Dixon called two witnesses, his mother and a representative of a Lubbock bail bond company.

The bondsman testified in his opinion a bond for bail of $10 million could "probably" not be obtained in Lubbock County.  He added, however, if his company made a bond for this amount it would require $1 million "upfront" and collateral "back[ing] the biggest part of the 10 million."  Based on conversations with Dixon's family, the bondsman believed Dixon's family could not obtain a bond for bail of $10 million.  According to the bondsman, his company might consider a bond of $100,000 without collateral.

Later in the habeas hearing, Dixon's counsel informed the court that another Lubbock bail bond company would make Dixon's bond in consideration for a cash payment of $1 million and collateral worth $3 million.

---

[1] Dixon testified that at the end of February or early in March 2012 he first became aware Sonnier was "seeing a lot of . . . women" other than Shetina, and he and Shepard at that time first discussed taking pictures to prove Sonnier's conduct to Shetina.

Dixon's mother, Mary Frances Archer Dixon, testified she resides in Spearman, Texas, where the family has long-standing ties. She acknowledged Dixon was a successful plastic surgeon prior to his arrest. His three children live in Amarillo. She also agreed he owned a business known as Sensei Med Spa but denied he received income from the business or his medical practice after his incarceration. She believed Sensei Med Spa was "breaking even" although at times was unable to meet its obligations. According to Dixon's trial testimony, Sensei Med Spa was "one of" his businesses. He described it as a day spa offering massages, manicures, pedicures and facials, and said he occasionally performed injections of fillers or Botox.

Dixon has no prior criminal convictions and has apparently never been released on bond. Trial testimony indicated that shortly before Sonnier's murder, Dixon traveled to Bermuda and sailed with a friend back to New York. After his initial questioning by police regarding the murder, Dixon flew to Dallas to pick up a car but immediately returned to Amarillo.

Dixon's mother also testified to his family's participation in his expenses. The family apparently pays Dixon's monthly $1,800 child support and $3,000 contractual alimony obligations. Mrs. Dixon agreed she and her family could not pay $1 million cash and provide collateral valued at $3 million. She acknowledged trial expenses were $1.25 million "or more," and agreed this obligation "put a severe financial bind on your ability to continue to pay attorneys' fees, and other things, expert fees" for Dixon. She agreed her family could afford a $100,000 bond and Dixon "personally" lacked the assets to pay the bond. As for property, she agreed Dixon's home, worth approximately $495,000, was encumbered by a lien securing a loan of about that amount.

4

On cross-examination, Mrs. Dixon acknowledged Dixon has an unspecified mineral interest paying "less than $150.00 a month." He is a defendant in a civil lawsuit brought by the Sonnier family but, she testified, none of his assets were placed in trust.

Dixon did not testify at the habeas hearing but his counsel made a statement to the court regarding assets. According to counsel, trusts created by Dixon when he began practicing medicine "have been depleted." Dixon's Sensei Med Spa business occupies leased premises. A Dodge truck and Porsche automobile were sold after Dixon's arrest. He apparently still owns a 1994 Jeep driven by his son and valued at no more than $2,000. Dixon's residence contains furniture, $1,800 cash, and "silver coins."

Dixon offered exhibits admitted during the hearing, which included: documentary proof that in two Lubbock County capital murder cases, one from 2005 and the other from 2012, the 140th District Court set bail at $1 million; a disc containing the testimony from Dixon's trial; and the affidavits of two jurors from Dixon's trial indicating they and other jurors were unwilling to find Dixon guilty of capital murder, murder, or manslaughter. Dixon's passport was also surrendered to the court.

Analysis

Through one issue, Dixon asserts the trial court abused its discretion by refusing to reduce his $10 million bail.

"'Bail' is the security given by the accused that he will appear and answer before the proper court the accusation brought against him, and includes a bail bond or a personal bond." TEX. CODE CRIM. PROC. ANN. art. 17.01 (West 2005). "A 'bail bond' is a written undertaking entered into by the defendant and the defendant's sureties for the

5

appearance of the principal therein before a court or magistrate to answer a criminal accusation . . . ." TEX. CODE CRIM. PROC. ANN. art. 17.02 (West Supp. 2014). The chief purpose of bail is securing the presence of the accused at trial on the offense charged. *See Ex parte Rodriguez,* 595 S.W.2d 549, 550 (Tex. Crim. App. [Panel Op.] 1980).

Setting the amount of bail for an accused is a decision committed to the discretion of the magistrate or court. *See* U.S. CONST. amend. VIII; TEX. CONST. art. I, § 13; TEX. CODE CRIM. PROC. ANN. art. 17.15 (West 2005). A trial court abuses its discretion if it acts without reference to any guiding rules or principles; that is, in an arbitrary or unreasonable manner. *Ex parte Hunt,* 138 S.W.3d 503, 505 (Tex. App.—Fort Worth 2004, pet. refused). A reviewing court will not disturb a ruling of the trial court if it is within the zone of reasonable disagreement. *Clemons v. State,* 220 S.W.3d 176, 178 (Tex. App.—Eastland 2007, no pet.) (per curiam). But an abuse of discretion review is more than merely concluding the trial court did not rule arbitrarily or capriciously. *Ex parte Beard,* 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. refused) (citing *Montgomery v. State,* 810 S.W.2d 372, 392 (Tex. Crim. App. 1990) (op. on reh'g)). Rather the analysis requires the reviewing court to measure the trial court's ruling against the relevant criteria on which the ruling was made. *Id.*

In a habeas case, the applicant bears the burdens of proving facts that would entitle him to relief and ensuring that a sufficient record is presented to show error requiring reversal. *Ex parte Kimes,* 872 S.W.2d 700, 703 (Tex. Crim. App. 1993). Therefore, the burden of proof is on an applicant claiming excessive bail. *Ex parte Rubac,* 611 S.W.2d 848, 849 (Tex. Crim. App. [Panel Op.] 1981); *Milner v. State,* 263 S.W.3d 146, 148 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A reviewing court will

6

not reduce the trial court's bail determination unless the applicant discharges his burden. *Ex parte Gentry,* 615 S.W.2d 228, 231 (Tex. Crim. App. 1981) (reducing bail amount after reviewing court was "completely satisfied that petitioner discharged her burden of showing her entitlement" to bail reduction); *Ex parte Welch,* 729 S.W.2d 306, 310 (Tex. App.—Dallas 1987, no pet.) (holding after considering "all of the evidence and factors relevant to determining the amount of bond," that "applicant has failed to satisfy his burden of showing that the trial court abused its discretion in refusing to lower applicant's bond").

The bail determination requires a court to strike a balance between the presumption of innocence enjoyed by the accused and the State's interest in assuring the accused appears for trial. *Ex parte Beard,* 92 S.W.3d at 573. Excessive bail is prohibited by the federal and state constitutions. *See* U.S. CONST. amend. VIII; TEX. CONST. art. I, § 13. Bail is excessive if it is "set in an amount greater than is reasonably necessary to satisfy the government's legitimate interests." *Ex parte Beard,* 92 S.W.3d at 573.

Exercising its discretion on a request for bail reduction, the trial court considers the following factors:

1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.

2. The power to require bail is not to be so used as to make it an instrument of oppression.

3. The nature of the offense and the circumstances under which it was committed are to be considered.

4. The ability to make bail is to be regarded, and proof may be taken upon this point.

5. The future safety of a victim of the alleged offense and the community shall be considered.

TEX. CODE CRIM. PROC. ANN. art. 17.15 (West 2005).

It is said the nature of the offense is a primary consideration in assessing bail. *See Ex parte Durst,* 148 S.W.3d 496, 500 (Tex. App.—Houston [14th Dist.] 2004, pet. refused) (majority op. on reh'g) (citing *Ex parte Rubac,* 611 S.W.2d at 849 ("The primary factors are the length of the sentence and the nature of the offense")); *Aviles v. State,* 26 S.W.3d 696, 698-99 (Tex. App.—Houston [14th Dist.] 2000, pet. refused) ("Two factors should be given great weight when determining the amount of bail: the nature of the offense and the length of the sentence"); *Ex parte Hulin,* 31 S.W.3d 754, 759 (Tex. App.—Houston [1st Dist.] 2000, no pet.) ("The primary factors to be considered in determining what constitutes reasonable bail are the punishment that can be imposed and the nature of the offense"); *see Ex parte Vazquez,* 558 S.W.2d 477, 480 (Tex. Crim. App. 1977) (noting possible punishment is a consideration). Capital murder is punishable by life in prison without parole or death. TEX. PENAL CODE ANN. § 12.31(a) (West Supp. 2014).

As for the ability to make bail, courts have required an accused to show an unsuccessful attempt to make bail before the amount of bail set can be found excessive. Such a showing is not required, however, when the defendant shows that his funds and those of his family have been exhausted. *Milner,* 263 S.W.3d at 149. But the accused's ability to make bail is not controlling; otherwise, "the role of the trial court

in setting bond would be completely eliminated and the accused would be in the position to determine what his bond should be." *Milner,* 263 S.W.3d at 150. "Bail set in an amount that no bondsman could make is not, for that reason alone, excessive." 41 George E. Dix & John M. Schmolesky, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 21:27 (3d ed. 2011) (citing *Wright v. State,* 976 S.W.2d 815 (Tex. App.—Houston [1st Dist.] 1998, no pet.)).

In order to set bail sufficiently high that the accused will comply with his undertaking, a magistrate gives consideration to matters other than those listed in article 17.15. Dix & Schmolesky at § 21:30. This includes the accused's personal situation. *Id.* Thus courts look to several common law factors including the accused's work record, family and community ties, length of residency, and aggravating circumstances alleged to have been involved in the charged offense. *See Ex parte Rubac,* 611 S.W.2d at 849-50 (listing these along with other factors not applicable here).

The procedural history of this case distinguishes it from most reported cases involving bond reduction appeals. The trial judge who conducted the habeas hearing also presided over Dixon's capital murder trial, and the record of testimony from the trial was presented at the habeas hearing. In particular, this procedural history distinguishes this case from one cited by Dixon, *Ex parte Evans*, which also addressed a bond reduction request after a mistrial caused by a deadlocked jury. *Ex parte Evans*, No. 06-11-000480-CR, 2011 Tex. App. LEXIS 5052 (Tex. App.—Texarkana July 6, 2011, no pet.) (mem. op., not designated for publication). In *Evans*, a visiting judge presided over the mistrial, and the trial evidence presented at the bond reduction hearing was limited. *Id.*, at *7-8. By contrast, in ruling on Dixon's bail-reduction request, the trial judge had

9

before him the capital murder trial evidence as well as the testimony and other evidence presented live at the habeas hearing.[2] And, in his role as factfinder at the habeas hearing, the trial judge necessarily made weight and credibility determinations. *Ex parte Gandara,* No. 08-10-00234-CR, 2011 Tex. App. LEXIS 9395, at *6 (Tex. App.—El Paso Nov. 30, 2011, no pet.) (mem. op., not designated for publication) ("In a habeas proceeding, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and the court may accept some, all, or none of a witness's testimony"). Those determinations may properly have had a bearing on the court's evaluation of the statutory and common law factors for setting bail, including those factors related to the charged offense and the circumstances under which it occurred.[3]

Dixon engaged in the practice of medicine in Amarillo from 2003 until his arrest. At the time of his trial, he was 50 years old. The current status of his medical license was not shown. As noted, he owns a mineral interest. Other than its leased premises, the assets of his spa business are not shown, nor any assets related to his medical practice. Dixon has no demonstrated ties to Lubbock County. He has "friends and family" in the Spearman area. Dixon's three children, ages twenty-six, nineteen and

---

[2] *See Ex parte Green*, No. 02-13-00474-CR 2014, Tex. App. LEXIS 1688, at *1 n.2 (Tex. App.—Fort Worth Feb. 13, 2014, no pet.) (mem. op., not designated for publication) (similar procedural history; in oral pronouncement denying reduction of bail, trial court "stated that it had considered 'all of the evidence previously [introduced at trial]' in making its determination").

[3] In that regard, the State emphasizes the "amount of time [Dixon] and Shepard spent plotting the murder." But of course Dixon has not been convicted of Sonnier's murder. Under the evidence at trial, however, it was not disputed the men devoted a significant effort to planning and pursuing their actions directed at Sonnier, whatever their nature.

fifteen, live in Amarillo. His eldest child is married. The nature of Dixon's relationship with his children was not clearly portrayed. These factors related to Dixon's personal situation and ties are essentially undisputed, but, considered individually or together, the trial court could have found them unconvincing as showing "an incentive to remain despite the possibility of conviction and sentence." Dix & Schmolesky at § 21:30.

In this court Dixon places heavy emphasis on Shepard's testimony explaining that he implicated Dixon only to obtain a favorable plea bargain and avoid a possible death penalty case against him. And Dixon emphasizes the two affidavits from jurors stating that as many as six jurors believed he was guilty of nothing but criminal trespass. Here, again, however, determinations of the weight to be given particular testimony and of its bearing on the factors for setting bail were determinations to be made by the trial court. The court was not required to assign to Shepard's trial testimony or the hearsay statements by two jurors the weight Dixon attributes to those items of evidence.

Dixon's evidence presented at the habeas hearing to support his contention he is unable to make bond on the assessed amount of bail was meager. One Lubbock bond company might write a bond, others would not. Further, Dixon's evidence cannot be seen as a serious effort to present his, or his family's, financial condition. His mother testified briefly, and largely in generalities. We agree with the State's assessment that the record does not indicate the extent of Dixon's or his family's "actual remaining resources." In short, Dixon may lack the financial wherewithal to post bond on the assessed $10 million bail, but the hearing record simply does not provide a dependable basis for such a conclusion.

11

From our research, Dixon's bail assessment is among the highest reported in Texas. *See Ex parte Durst,* 148 S.W.3d at 501 (reducing bail from $1 billion per case in three third-degree felony cases to $150,000 per case); *Beard,* 92 S.W.3d at 567, 573-74 (ordering bail of $8 million reduced to $500,000). But, as courts have often recognized, the reported cases are not an effective gauge for our review of the trial court's determination.

> Case law is of relatively little value in addressing the ultimate question of the appropriate amount of bail in a particular case because appellate decisions on bail matters are often brief and avoid extended discussions, and because the cases are so individualized that generalization from results reached in others is difficult.

*Beard,* 92 S.W.3d at 571 (citing 41 George E. Dix & Robert O. Dawson, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 16.51 (2d ed. 2001) (quotation marks omitted)).

## Conclusion

Given the grave nature of the offense with which he is charged and the potential sentence on conviction, *Ex parte Rubac,* 611 S.W.2d at 849, on the record we are presented, we cannot say the habeas judge abused his discretion by finding Dixon failed to carry his burden to show his entitlement to a bail reduction. We affirm the court's order denying Dixon's requested bail reduction.

Per Curiam

Do not publish.