**Ex parte Tara Y. HULIN, Appellant.**

**No. 01–00–00963–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 26, 2000.

Tony Aninao, Houston, for appellant.

John B. Holmes, Calvin Hartmann, Houston, for State.

Panel consists of Justices MIRABAL, TAFT, and DUGGAN.*

---

\* The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. TEX.PEN.CODE ANN. 15.031(a) (Vernon Supp. 2000).

## OPINION

TIM TAFT, Justice.

Appellant, Tara Y. Hulin, challenges the trial court's refusal to grant her the full habeas corpus relief she requested by lowering her combined bail for two criminal charges from $200,000 to $30,000. We address whether the trial court abused its discretion by lowering bail in one case from $100,000 to $50,000, but refusing to lower $100,000 bail in a second case. We affirm.

### Facts

Appellant stands charged with two criminal offenses: criminal solicitation of a 15–year–old minor,[1] case number 849956, and sexual assault of him,[2] case number 849957, both alleged to have occurred on May 19, 2000. On July 17, 2000, appellant was arrested in North Carolina on these two charges, and she waived extradition. Initially, bail was set at $50,000 for each charge, but the trial court raised the bail to $100,000 each. Appellant filed a petition for writ of habeas corpus, requesting reduction of the combined bail for the two offenses to $30,000.

On August 17, 2000, the trial court heard appellant's application. At the State's request, the trial judge took judicial notice of complaints, attached probable cause statements, and indictments in case files 849956 and 849957. By agreement of the parties, other evidence was introduced by way of affidavits. Appellant introduced her affidavit and that of her husband, Tony Hulin. The State introduced the affidavit of Officer Gary A. Spurger, an investigator assigned to appellant's case, and the affidavit of complainant's mother. No live testimony was taken.

2. TEX.PEN.CODE ANN. 22.011(a)(2)(C) (Vernon Supp.2000).

Based on its evidence, the State asserts that, over the course of several months, despite complainant's mother's admonitions to her not to, the 31–year-old appellant, aggressively pursued and consummated a sexual relationship with complainant. Complainant and appellant met, corresponded, and exchanged pictures of one another over the internet. During this time, appellant sent complainant numerous gifts, including a pair of her underwear, watches, jewelry, and a cordless telephone so they could communicate without being overheard.

Officer Spurger had examined appellant's computer files, which revealed appellant had corresponded with other teenage boys in addition to complainant, including a 13–year-old in Tennessee and a 16–year-old in Massachusetts. In a November 29, 1999 conversation with complainant's mother, appellant told her, "I've also had many young guys (including a 15–YO thirty minutes away) that live close by IMing [instant messaging] me and wanting me to meet them."

The computer files also revealed appellant had sought information to circumvent marriage laws in the United States. She e-mailed complainant that if his mom did not allow them to meet when he turned 16, "then we'll just go to Mexico and get married. I love you!" A few days later, she e-mailed the Scottish government, inquiring if a person could marry there at age 16.

Information on appellant's computer files also showed appellant had an interest in the case of Mary Kay LeTourneau, a Washington school teacher who had an affair with a teenage boy, was sentenced to probation, violated the court's order to stay away from the boy, had sex with him, and became pregnant. About this, appellant said,

> Mary Kay did not 'rape' a child. She loved, not too wisely, but too well.... Had she but known beforehand [that the age of consent in Spain is 12], Mary could have simply divorced, remarried

her young man in Spain, and returned to Seattle with a fully valid 'full faith and credit' marriage, protected under United States law. Her 'crime' is to have made a procedural error, not to have damaged anyone. She just didn't do the paperwork right.

Appellant sent complainant a videotape movie of the LeTourneau story.

Officer Spurger attested as follows to other communications from appellant to complainant or made by appellant about complainant:

> On March 21, 2000, the Defendant told the complainant, 'I don't want to have these fat ugly thighs when I make love to my baby.' On March 24, 2000, the Defendant sent him an email greeting card part of which said 'I can't do a damn thing today but think about making love with you.' In her internet profile, the Defendant listed the following: 'FULL NAME: Tara Dawn Younts Hulin ( [complainant's last name] ) SEX: Right now, unfortunately, only phone sex with my baby, [complainant]. It'll have to do for now until we are able to make mad, passionate love someday soon. IF YOU COULD MEET ONE PERSON, DEAD OR ALIVE, WHO WOULD IT BE? [Complainant!] And I will meet him soon!' On April 2, 2000 the Defendant told the complainant, 'I think you're the sexiest guy alive! Everything you say and do turns me on! I can only imagine what it's going to be like to actually be with you in the flesh! I cannot wait.' On April 20, 2000, the Defendant told the complainant that she had ordered an HIV test for him. 'PLEASE make sure that you go ahead and do the test and send it in as soon as possible. I know that you love me and you want to protect me ... right? It's just something that I need to know. I would still be with you if you were HIV positive but you'd just have to use protection for now.' On May 5, 2000, the Defendant told him, 'I want to see and touch you so badly.'

On May 17, 2000 the Defendant told the complainant 'I don't want to jeopardize my plans with you this weekend by pissing Tony off or looking suspicious.' In reference to the boy's parents, she said, 'I know they despise me but they love you and so do I. I want them to see that I'm not a whacko, despite the fact that I'm in love with their 15 year old son.... I just hope that this weekend doesn't screw things up. We need to be extremely careful! Your mom would be so pissed if she found out that I didn't respect her wishes to stay away from you.'

Officer Spurger spoke to complainant, who stated that on May 19, 2000, appellant flew from her home in North Carolina, and picked him up at a friend's house. Later that day, she drove them to her room at the Intercontinental Airport Mariott where they had sexual intercourse numerous times. Complainant also stated he had sexual intercourse with appellant at the Intercontinental Airport Mariott several more times on May 20 and May 21.

Officer Spurger also spoke with a friend of complainant who stated he had met appellant when she came to Houston in May. The friend stated that on July 12, 2000, he received a phone call from appellant in which she told him that the police had taken her computer, and not to tell the police anything except that they went to a concert in Houston.

Officer Spurger obtained records from the Greenspoint Mariott that showed appellant had reserved a room there for four nights beginning August 28, 2000.

In her affidavit, complainant's mother stated that if appellant's bond were reduced, she would be a threat to complainant because, even after the police seized appellant's computer, she called to ask if that meant she could not talk to complainant anymore. When complainant's mother told appellant, yes, that was the case, appellant asked complainant's mother twice to tell complainant that she loves him. During the time appellant was communicating with complainant, she asked complainant to have his mother view the tape regarding Mary Kay LeTourneau so she could better understand her relationship with complainant.

Complainant's mother stated that appellant seems to be obsessed with her son. She sternly warned appellant several times not to meet her son in person, and that, if she did, she would be arrested. She said that appellant told her that she would respect her wishes, yet despite this, she flew to Houston and met with her son. Her son told her that, when appellant came to Houston, she drove by their home, so she knows where they live.

Complainant's mother stated that her son suffers from bipolar disorder and depression; that he has come a long way in realizing appellant's feelings for him were not normal, but she felt that one phone call to her son from complainant would put him back at square one emotionally. At one point in complainant's and appellant's correspondence, he told appellant he was feeling depressed, to which appellant responded that, if he needed to leave this world, she would understand. Complainant's mother expressed concern that, if appellant contacted her son again, she might again encourage suicide, and that, if appellant were released on bond, she would have to babysit her telephone and watch her son 24 hours a day. She stated that, because complainant suffers from panic attacks, he is a homebound student, making him more vulnerable to contact. She stated that, between the time appellant was questioned and arrested, they were living a nightmare, making sure that appellant and her son had no contact and that her son did not commit suicide.

In his affidavit, Tony Hulin swore to the following. He and appellant have been married 10 years, living their last seven years in their Davidson County, North Carolina home, which they own and for which they are paying off a mortgage. Living with them are his 13–year–old son,

by a prior marriage, and their eight-year-old daughter. Appellant has been a good mother to these children, active at their schools and in the community. There has never been inappropriate conduct between her and the children, and she has always assisted him in providing them a safe and healthy environment.

Appellant has lived her entire 31 years in Davidson County, North Carolina, where her mother, father, and brother also reside in close proximity to the Hulin home. Appellant has no relatives living outside the country. Upon her arrest at their home, appellant agreed to be extradited to Texas to answer the charges against her.

Appellant worked for the United States Postal Service for six years, but has been off work for the last year and one-half because of a back injury. During this time they have had to get by without her income.

Appellant has never displayed any signs of violence, nor been arrested before this incident. If appellant were released on bond, she would not pose a flight risk, and he would assist in insuring that she make all of her court appearances in Houston.

If appellant were released on bond, her husband would disconnect all internet services, and remove the family computer from their home. He is willing to disconnect the long distance telephone service and block the complainant's phone number from their incoming service.

Appellant was unable financially to make bond when it was set at $200,000. However, she could borrow $3,000 from her grandmother to pay the 10 per cent premium for a $30,000 bond.

In her affidavit, appellant swore to the following. Although she suffers from mental illness, she believes she is competent to make the affidavit. She does not personally have the funds to make the bail set at $200,000, nor the 10 percent premium required by a bondsman. She does not have sufficient property to post as security for a bond in the amount of the bail. She has been unable to borrow sufficient funds from friends and relatives to make the $200,000 bail.

She has no prior arrests or convictions. If released on bond, she will pose no flight risk, but will report to the court as instructed. Since her arrest, she has made no attempts to contact the complainant, despite the fact that, since she has been in custody, she has had access to the telephone and United States mail. If she is released on bond, she assures the court she will continue not to have contact with complainant, and will follow any other conditions the court places on the bond.

At the conclusion of the hearing, the trial judge lowered the bail on the criminal solicitation of the minor charge to $50,000, but refused to lower the bail on the sexual assault charge. Appellant gave timely notice of appeal.

## Propriety of Bail

In her sole point of error, appellant asserts the trial court erred by refusing to lower the pretrial bail on the sexual assault charge and refusing to lower the bail on the criminal solicitation of a minor charge any more than $50,000.

■ There is no precise standard for reviewing bond settings on appeal. *Ex parte Pemberton*, 577 S.W.2d 266, 267 (Tex.Crim.App.1979); *Wright v. State*, 976 S.W.2d 815, 819 (Tex.App.—Houston [1st Dist.] 1998, no pet.). A reviewing court is guided by article 17.15 of the Texas Code of Criminal Procedure. *Wright*, 976 S.W.2d at 819. Article 17.15 provides:

The amount of bail to be required in any case is to be regulated by the court, judge, magistrate or officer taking the bail; they are to be governed in the exercise of this discretion by the Constitution and by the following rules:

(1) The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.

(2) The power to require bail is not to be so used as to make it an instrument of oppression.

(3) The nature of the offense and the circumstances under which it was committed are to be considered.

(4) The ability to make bail is to be regarded, and proof may be taken upon this point.

(5) The future safety of a victim of the alleged offense and the community shall be considered.

TEX.CODE CRIM.P.ANN. art. 17.15 (Vernon Supp.2000).

 It is the defendant's burden to show that bail is excessive. *Ex parte Rubac*, 611 S.W.2d 848, 849 (Tex.Crim.App. 1981); *Ex parte Willman*, 695 S.W.2d 752, 754 (Tex.App.—Houston [1st Dist.] 1985, no pet.). The primary factors to be considered in determining what constitutes reasonable bail are the punishment that can be imposed and the nature of the offense. *Rubac*, 611 S.W.2d at 849; *Hughes v. State*, 843 S.W.2d 236, 237 (Tex. App.—Houston [14th Dist.] 1992, no pet.). Other circumstances and factors to be considered in determining the amount of bail include: family ties, residency, ability to make bond, aggravating factors involved in the offense, the defendant's work history, prior criminal record, and previous outstanding bonds. *Rubac*, 611 S.W.2d at 849–50; *Willman*, 695 S.W.2d at 754. The ability to make bail does not alone control the amount of bail. *Ex parte Charlesworth*, 600 S.W.2d 316, 317 (Tex.Crim.App. 1980). The future safety of a victim of the alleged offense and the community shall be

considered. *See Ex parte Prelow*, 929 S.W.2d 54, 56 (Tex.App.—San Antonio 1996, no pet.).

## A. Nature of the Offense and Circumstances of Its Commission

 The nature of the offense necessarily involves the punishment authorized by law. *Ex parte Ivey*, 594 S.W.2d 98, 99 (Tex.Crim.App.1980). Here the offenses charged are criminal solicitation of a minor, a felony of the third degree,[3] and sexual assault of a child, a felony of the second degree.[4] Because appellant has no prior criminal history, the range of punishment she faces for criminal solicitation of a minor is five years deferred adjudication community supervision to 10 years imprisonment and up to a $10,000 fine, if punishment is tried to a judge,[5] and two years regular community supervision to 10 years imprisonment and up to a $10,000 fine, if punishment is tried to a jury.[6] The range of punishment appellant faces for sexual assault of a child is five years deferred adjudication community supervision to 20 years imprisonment and up to a $10,000 fine, if punishment is tried to a judge,[7] and two years community supervision to 20 years imprisonment and up to a $10,000 fine, if punishment is tried to a jury.[8]

The trial judge had before her uncontroverted evidence of a 31–year–old woman who pursued, and accomplished the sexual molestation of, a 15–year–old boy, a crime in which an adult preys upon and exploits the vulnerability and immaturity of a child. Sexual assault of a child is a serious offense. *See Compian v. State*, 7 S.W.3d

3. TEX.PEN.CODE ANN. 15.031(e) (Vernon Supp. 2000); TEX.PEN.CODE ANN. 22.011(f) (Vernon Supp.2000).

4. TEX.PEN.CODE ANN. 22.011(f) (Vernon Supp. 2000).

5. TEX.CODE CRIM.P.ANN. art. 42.12 § 5 (Vernon Supp.2000); TEX.PEN.CODE ANN. 12.34(a),(b) (Vernon 1994).

6. TEX.CODE CRIM.P.ANN. art. 42.12 § 4(b)(c), § 3(b) (Vernon Supp.2000); TEX.PEN.CODE ANN. § 15.031(a) (Vernon Supp.2000); TEX.PEN.

CODE ANN. § 22.011(f) (Vernon Supp.2000); TEX.PEN.CODE ANN. § 12.34(a),(b).

7. TEX.CODE CRIM.P.ANN. art. 42.12 § 5 (Vernon Supp.2000); TEX.PEN.CODE ANN. 12.33(a),(b) (Vernon 1994).

8. TEX.CODE CRIM.P.ANN. art. 42.12 § 4(b)(c), § 3(b) (Vernon Supp.2000); TEX.PEN.CODE ANN. § 12.33 (Vernon 1994).

199, 200 (Tex.App.—Houston [14th Dist.] 1999, no pet.). Moreover, the evidence of the circumstances surrounding commission of the offense supported a conclusion that it was more than a single, isolated event, but occurred multiple times over a period of three days. There was additional evidence that appellant reserved a room for four nights in Houston in August, raising the question whether she intended to repeat the charged conduct. Further, there was evidence that appellant corresponded by internet with other young boys in other states.

## B. Aggravating Factors Involved in the Offense

In considering what constitutes reasonable bail, aggravating factors involved in the offense should be considered. *Rubac,* 611 S.W.2d at 850. Where the nature of the offense is serious and involves aggravating factors, the likelihood of a lengthy prison sentence following trial is great. *Compian,* 7 S.W.3d at 201 (citing *Ex Parte Sandoval,* 576 S.W.2d 634, 636 (Tex.Crim. App.1978)).

 To prove the essential elements of sexual assault, the State simply has to prove (1) a person, (2) intentionally or knowingly, (3) caused the sexual organ of a child, (4) to contact the sexual organ of another person. *See* Tex.Pen.Code Ann. § 22.011(a)(2)(C). To prove the essential elements of criminal solicitation of a minor to sexual assault, the State simply has to prove: (1) a person, (2) with an intent that sexual assault of a child be committed, (3) requests, commands, or attempts to induce a minor to engage in specific conduct, that under the circumstances surrounding the actor's conduct, as the actor believes them to be, would make the minor a party to the commission of sexual assault of a child. *See* Tex.Pen.Code Ann. § 15.031(a).

Here, the trial judge was presented with prima facie evidence tending to establish the essential elements of both offenses. However, beyond the evidence tending to establish the facts necessary for an essential-elements conviction, the trial judge was also presented with prima facie evidence tending to establish both mitigating and aggravating factors. Mitigating factors that tended to be established by the prima facie evidence were that: (1) appellant has no prior criminal history; and (2) appellant is mentally ill.

The prima facie evidence tended to establish a number of aggravating factors: (1) appellant gave solace, if not tacit encouragement, to complainant's self-destructive, suicidal notions, yet was anxious to protect herself from any harm that might befall her from a sexually transmitted disease from the illicit relationship she was pursuing; (2) while professing love for complainant, she gave solace to complainant's self-destructive, suicidal notions; (3) the complainant is fragile mentally and emotionally, suffering from bipolar disorder and depression; (4) by molesting complainant, appellant disregarded and disrespected her role as a wife and mother and the maternal wishes of a fellow mother, complainant's, that her child not be violated; (5) appellant engaged in the illicit conduct in the face of complainant's mother's warning that she would be arrested if she did so; (6) appellant lied to complainant's mother, telling her she would not meet with complainant, yet she did so surreptitiously; (7) appellant acted deceitfully toward her husband when she left North Carolina to come to Houston; (8) appellant pursued complainant not in just a chance encounter, but over a period of months; (9) appellant involved one of complainant's friends in arranging the surreptitious, illicit liaison between herself and complainant; and (10) after her computer was seized, appellant sought to obstruct justice by encouraging complainant's friend to lie about what appellant and complainant did on the weekend in question.

In weighing the evidence supporting the mitigating and aggravating factors, the trial judge could have reasonably given greater weight to the evidence supporting the aggravating factors so as to conclude

that, at trial, appellant would receive punishment toward the high end of the range of punishment for the charged offenses. Pretrial bond in these kind of cases should be set sufficiently high to secure the presence of the accused at trial because the accused's reaction to the prospect of a lengthy prison sentence might be not to appear. *Compian,* 7 S.W.3d at 201.

## C. Sufficiency of the Bail Amount to Assure Court Appearances

The facts paramount to setting bail sufficiently high to assure appellant's court appearances are: (1) her residence out of state; and (2) the aggravated nature of her alleged crimes, which could produce lengthy prison sentences. Appellant's willingness to be extradited should also be considered, along with her husband's assurances he would be sure she would appear. If assuring appellant's presence were the only consideration, appellant's request for $30,000 total bail might not be unreasonable.

## D. Appellant's Ability to Make Bail

■ Appellant testified she could make a bond in the amount of $30,000, which is considerably below the $150,000 bail. Ability to make bail is a factor to be considered, but ability alone, even indigency, does not control the amount of bail. *Ex parte Penagos,* 810 S.W.2d 796, 798 (Tex.App.—Houston [1st Dist.] 1991, no pet.). Although appellant testified she could not make bail of $200,000, or even 10 percent of it, she did not address her ability to make bail at $150,000, or 10 percent of that. This is normally fatal to a claim that lowered bail is too high. *See Roy v. State,* 854 S.W.2d 931, 931 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) (holding, in absence of some evidence that appellant has unsuccessfully attempted to secure a bond in the lowered amount set by the court, no issue was presented for review).

## E. Future Safety of the Victim

The trial judge considered affidavit evidence from complainant's mother that: if appellant were released, she would have to babysit her telephone and watch her son 24 hours a day; appellant knew where they lived; and one phone call from appellant to her son could put him back at square one emotionally. On the other side of this issue was appellant's affidavit testimony that, despite her access to phones and mail while in jail, she had not attempted to contact complainant. Further, appellant gave the court her assurance that, if released on bail, she would continue to avoid contact with complainant and abide by whatever conditions the court placed on her bond. Also weighing in appellant's favor on this issue were her husband's assurances that, if appellant were granted bail, he would eliminate the internet and long distance service to their home.

In weighing this issue, the trial judge could reasonably have heavily weighted the evidence tending to show appellant's deceitfulness discussed above under "Aggravating Factors Involved in the Offense," as well as the evidence tending to support a proclivity to look for ways to circumvent the law, as in her interest in going to other countries where the age of consent to marry is lower than in Texas. Under the unusual circumstances of this case, it is likely the trial court gave more weight to protecting the victim than any other factor, and we do not find this to be unreasonable.

## F. Flight Risk Considerations

Considerations such as family ties, residency, work history, prior criminal record, and adherence to prior bonds are all designed to gauge a defendant's flight risk potential. Here, the trial judge could have reasonably decided that appellant's lack of a criminal history, waiver of extradition when arrested, and assurances of compliance with the bond were outweighed by her lack of family or residential ties to Harris County, her unemployment, and

the evidence of her deceitfulness and disrespect for the law.

### G. Not an Instrument of Oppression

Generally, setting bail above that necessary to assure compliance with court appearances has been considered oppressive. *See Ex parte Harris*, 733 S.W.2d 712, 714 (Tex.App.—Austin 1987, no pet.). With the addition of consideration of future danger to the victim to article 17.15 in 1985,[9] however, high bail takes on another function. Naturally, the trial court may condition granting a high bond upon having no contact with the victim. Nevertheless, considering both the mental instability of appellant and the victim, as well as the life-threatening vulnerability of the victim, we cannot say bail set at $150,000 is an instrument of oppression under the facts of this case.

### Conclusion

Based on the evidence before the trial judge and the foregoing considerations, we cannot say that the bail set by the trial judge was unreasonable or constituted error. We overrule appellant's sole point of error. We affirm the judgment.

---

9. Rights of Crime Victims Act, 69th Leg. R.S, ch.235, § 2, 1985 Tex.Gen.Laws 2217, 2219.