In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-18-00113-CR
EX PARTE RAFAEL LEOS-TREJO

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 18-02-02293-CR**

**MEMORANDUM OPINION**

Appellant Rafael Leos-Trejo appeals the trial court's denial of his pretrial habeas corpus application requesting that his bail be reduced from $500,000 to $10,000. We affirm.

Background

Leos-Trejo was charged by information on February 23, 2018, for the first-degree murder of his wife, for "intentionally or knowingly caus[ing] the death of an individual, namely: Jessica Leos, by shooting her with a firearm[.]" *See* Tex. Penal Code Ann. § 19.02(b)(1) (West 2011). Leos-Trejo filed a Motion to Set Reasonable Bond, arguing that the current bond of $500,000 was excessive and requesting that

1

the bond be reduced to $10,000. The trial court denied Leos-Trejo's motion. Thereafter, on March 12, 2018, Leos-Trejo filed an Application for Writ of Habeas Corpus and Motion for Reasonable Bond, arguing that bond of $500,000 was excessive and unreasonable under the Eighth Amendment of the United States Constitution and Article I, sections 11 and 13 of the Texas Constitution. Leos-Trejo argued that he had been unable to raise the funds to meet the current bond requirement, that he had no prior criminal history, that he had ties to the community, and that he was not a continuing danger to society. Leos-Trejo requested that bond be reduced to $10,000. After a hearing, the trial court denied the application, and Leos-Trejo appealed.

Evidence at the Hearing

Testimony of J.P.[1]

J.P. testified that she met Leos-Trejo in Mexico when he was eleven years old and that she had known his wife Jessica for about ten years. J.P. explained that she knew Leos-Trejo had relatives in Mexico, including his father, uncles, and grandmother. J.P. also explained that Leos-Trejo had a cousin who lived in San Antonio with his family. J.P. agreed that she was aware that Leos-Trejo had traveled to Dubai, Canada, New York, Mexico, and Pennsylvania and that in his job as a

---

[1] We use initials to identify uncharged witnesses herein.

truck driver, he travels within the United States. J.P. understood Leos-Trejo and his wife to have two cars, a Mustang and a Volkswagen. According to J.P., she had never observed Leos-Trejo and his wife quarrel or have a physical confrontation, and they seemed to have a good marriage and get along fine. J.P. testified that she had not known Leos-Trejo to commit a violent act against another person. J.P. explained that, in her opinion, Leos-Trejo would not flee the jurisdiction if he bonded out of jail. J.P. agreed that, if Leos-Trejo were released on bond, that she would let him live with her if necessary.

Testimony of A.L.

A.L. testified that she had known Leos-Trejo and his wife Jessica for about three years, and that she socialized with the couple about every other week. She agreed that if Leos-Trejo needed a place to stay, he could stay at her house, and that she would be willing to give him a ride to work or to court. According to A.L., Jessica never reported that Leos-Trejo was aggressive or that she was considering divorce. A.L. explained that she had met and visited Leos-Trejo's parents in Mexico, and she agreed that his family was "well-to-do" because his father and grandmother own businesses. A.L. also was aware that Leos-Trejo and his wife travelled a lot, that he travelled in his job as a truck driver, and that he had friends across the nation.

Testimony of J.A.

J.A. testified that he had known Leos-Trejo and his wife Jessica for about nine months, and that he worked with Leos-Trejo at Sierra Mountain Express, where J.A. was a dispatcher and Leos-Trejo was a truck driver. J.A. agreed that Leos-Trejo and Jessica appeared to be a happy couple. J.A. explained that, if Leos-Trejo bonded out, he would be willing to provide him with employment, as Leos-Trejo had been a reliable driver.

Testimony of W.R.

W.R. testified that he had known Leos-Trejo for just over a year. W.R. explained that he worked with Leos-Trejo and socialized with Leos-Trejo and Jessica about twice a month. W.R. agreed that if Leos-Trejo were to bond out, W.R. would be able to help Leos-Trejo out financially, and give him a ride or a place to stay. According to W.R., he had already offered Leos-Trejo a job with his transportation company. W.R. explained that he was aware that Leos-Trejo and Jessica took vacations, including travelling to Cuba and Dubai. W.R. agreed that Leos-Trejo was law-abiding and not a threat to the community.

Testimony of Leos-Trejo

Leos-Trejo testified that he is a citizen of the United States, that he had lived in Montgomery County for a year, that he previously lived in Fort Bend County for

4

about two and a half years, and that he has been in the United States for nine years. Leos-Trejo explained he had never been convicted for any offense, never had to make a bail bond, never forfeited a bail bond, and had never failed to appear in court. Leos-Trejo testified that he has "[m]aybe 10, 15[]" relatives in San Antonio and Fort Worth. He also agreed he has family in Mexico, some of whom own businesses. Leos-Trejo further testified that he had travelled to Dubai and Cuba within the past year, and he had also travelled to Canada, New York, Pennsylvania, Las Vegas, and Spain. According to Leos-Trejo, his wife had financed their trips.

Leos-Trejo explained that he and Jessica purchased a house in Spring in May of 2017 that was valued at about $218,000 at the time of purchase, and the property includes an in-ground pool. Leos-Trejo explained that in his work as a transport carrier for Ford Motor Company, he transports new vehicles to dealerships in Houston and Louisiana, and that he makes about $30,000 to $40,000 per year. He agreed that he has a commercial driver's license. He testified that if he was released on bond, he would be able to work for W.R. and that he is "leasing/purchasing" his own truck. He further testified that he would like to seek the court's permission to go to Baton Rouge on work. According to Leos-Trejo, Jessica worked in purchasing for a food service company, and she was the primary breadwinner in the family, making about $98,000 per year. According to Leos-Trejo, he leased a Mustang, and

5

he was buying an eighteen-wheeler through a lease-purchase program. He explained that, although he does not know how much the eighteen-wheeler is worth, he pays about $1900 every two weeks towards its purchase.

Leos-Trejo testified that the family lived "check by check[]" and had no savings or investments. Leos-Trejo testified that he had no funds anywhere upon which he could draw to make bond. He explained that he would be willing to sell his personal possessions, such as TVs, a pool table, and speakers, but he was not sure if selling such items would raise even $10,000 to $15,000. Leos-Trejo testified "I don't have to run. I don't have to flee because it was an accident, and I'm innocent[.]"

The defense proffered that it had contacted three bonding companies and all had said they were unable to make a $500,000 bond. The State proffered a drawing made by the deceased's eleven-year-old daughter made during a forensic interview, which depicted the location of her mother, Leos-Trejo, and the kitchen table. In the forensic interview, the daughter had explained that Leos-Trejo had been out drinking the night of the incident, and at some time after he returned home, she observed him sitting in the kitchen across from her mother, and the daughter saw an assault rifle in his lap. The daughter told the interviewer that she was "freaking out[]" after her mother was shot, and she heard Leos-Trejo tell 911 that "It was an accident." The daughter also told her interviewer that Leos-Trejo told her that her mother was

"beyond saving[]" and said "You saw this. You saw this happen. It was an accident. You saw this happen." The daughter also told the interviewer that she saw Leos-Trejo aim the rifle at her mother, after which the daughter went upstairs; however, she heard him say "You ruin everything[,]" and heard a click and a gunshot. The State explained that Jessica's autopsy revealed stippling on only one side of her face and that the daughter had reported a history of domestic violence between her mother and Leos-Trejo. The State also explained that Leos-Trejo had prevented the daughter from calling 911 by taking her phone.

The trial court denied the request for bail reduction from the bench, explaining that it had "not seen evidence of exhaustion of family funds or the defendant's own funds at this point." The trial court also noted it had taken into consideration Leos-Trejo's work record, residency, and the aggravated circumstances that had been alleged. The trial court subsequently signed an order denying bond reduction. Leos-Trejo appealed.

Review of Trial Court's Setting of Bail

We have jurisdiction over an appeal from a trial court's merit-based denial of habeas proceedings. *See Ex parte Hargett*, 819 S.W.2d 866, 868-69 (Tex. Crim. App. 1991). We review the denial of an application for writ of habeas corpus under an abuse of discretion standard. *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim.

7

App. 2006); *Ex parte Klem*, 269 S.W.3d 711, 718 (Tex. App.—Beaumont 2008, pet. ref'd). We consider the entire record and review the facts in the light most favorable to the trial court's ruling. *Kniatt*, 206 S.W.3d at 664; *Klem*, 269 S.W.3d at 718. We afford almost total deference to the trial court's determination of historical facts supported by the record, especially findings that are based on an evaluation of credibility and demeanor. *Klem*, 269 S.W.3d at 718. We afford the same deference to the trial court's rulings on the application of the law to fact questions when the resolution of those questions turns on an evaluation of credibility and demeanor. *Id.* If the trial court's resolution of the ultimate issues turns on an application of legal standards, we review the determination de novo. *Id.*

Similarly, we review a trial court's ruling on the setting of bail under an abuse of discretion standard of review. *See* Tex. Code Crim. Proc. Ann. art. 17.15 (West 2015) (affording a trial court discretion to set bail); *Ex parte Rubac*, 611 S.W.2d 848, 850 (Tex. Crim. App. [Panel Op.] 1981). The defendant has the burden to show the bail set by the trial court is excessive. *Ex parte Rodriguez*, 595 S.W.2d 549, 550 (Tex. Crim. App. [Panel Op.] 1980). The trial court's ruling will not be disturbed if it is within the zone of reasonable disagreement. *Clemons v. State*, 220 S.W.3d 176, 178 (Tex. App.—Eastland 2007, no pet.) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)).

An appearance bond secures the presence of a defendant in court for trial. *Ex parte Rodriguez*, 595 S.W.2d at 550. The United States and Texas Constitutions prohibit excessive bail. U.S. Const. amends. VIII, XIV; Tex. Const. art. I, §§ 11, 13; *Ex parte Sabur-Smith*, 73 S.W.3d 436, 439 (Tex. App.—Houston [1st Dist.] 2002, no pet.). (The right to reasonable bail is protected by the United States and Texas Constitutions.). The trial court should set bail sufficient to provide reasonable assurance the defendant will appear at trial, but not so high as to be oppressive. *See* Tex. Code Crim. Proc. Ann. art. 17.15(1), (2); *Ex parte Ivey*, 594 S.W.2d 98, 99 (Tex. Crim. App. 1980). Bail is excessive if it is "set in an amount greater than [what] is reasonably necessary to satisfy the government's legitimate interests." *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. ref'd) (citing *United States v. Salerno*, 481 U.S. 739, 753-54 (1987)). When setting the amount of bail, the trial court weighs the State's interest in assuring the defendant's appearance at trial against the defendant's presumption of innocence. *Id.* The amount of bail may be deemed oppressive when the trial court sets the bail at an amount "for the express purpose of forcing [a defendant] to remain incarcerated[.]" *Ex parte Harris*, 733 S.W.2d 712, 714 (Tex. App.—Austin 1987, no pet.).

## Analysis

In his sole issue, Appellant argues that the bail set is excessive and unreasonable under the Eighth Amendment of the United States Constitution; article I, sections 10, 11, and 13 of the Texas Constitution; and articles 1.07 and 17.15 of the Texas Code of Criminal Procedure.

To determine whether the trial court abused its discretion, we consider the rules found in article 17.15 of the Code of Criminal Procedure as well as the factors set out in *Rubac*. *See* Tex. Code Crim. Proc. Ann. art. 17.15; *Ex parte Rubac*, 611 S.W.2d at 849-50. The Texas Legislature has imposed the following statutory requirements:

> 1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.
>
> 2. The power to require bail is not to be so used as to make it an instrument of oppression.
>
> 3. The nature of the offense and the circumstances under which it was committed are to be considered.
>
> 4. The ability to make bail is to be regarded, and proof may be taken upon this point.
>
> 5. The future safety of a victim of the alleged offense and the community shall be considered.

Tex. Code Crim. Proc. Ann. art. 17.15.

10

When setting the amount of bail, the trial court may also give consideration to such factors as (1) the accused's work record; (2) the accused's family and community ties; (3) the accused's length of residency; (4) the accused's prior criminal record; (5) the accused's conformity with previous bond conditions; (6) the existence of other outstanding bonds, if any; and (7) aggravating circumstances alleged to have been involved in the charged offense. *See Maldonado v. State*, 999 S.W.2d 91, 93 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (citing *Ex parte Rubac*, 611 S.W.2d at 849-50).

We first note that the record contains no indication that the trial court set the amount of bail for the sole purpose of ensuring that Leos-Trejo remains incarcerated pending trial. *See Montalvo v. State*, 315 S.W.3d 588, 596 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("Our independent review of the habeas corpus record likewise does not suggest that the trial court deliberately set bail at an excessively high level solely to prevent Montalvo from posting bail.").

The nature of the offense and the circumstances surrounding the offense are factors in determining what constitutes reasonable bail. Tex. Code Crim. Proc. Ann. art. 17.15(3). In considering the nature of the offense, it is proper to consider the possible punishment. *Ex parte Vasquez*, 558 S.W.2d 477, 479-80 (Tex. Crim. App. 1977). When the nature of the offense is serious and involves aggravating factors, a

11

lengthy prison sentence following trial is probable. *Ex parte Hulin*, 31 S.W.3d 754, 760 (Tex. App.—Houston [1st Dist.] 2000, no pet.). Therefore, the pretrial bail must be set sufficiently high to secure the presence of the accused at trial because the accused's reaction to the prospect of a lengthy sentence might be to flee and fail to appear. *Id.* at 761.

In this case, Leos-Trejo was charged with first-degree murder, an offense that carries a sentence of 5 to 99 years or life and a fine not to exceed $10,000. *See* Tex. Penal Code Ann. § 12.32(a) (West 2011), 19.02(b)(1), (c). Thus, the record reflects that the nature of the offense is very serious and it carries a possible life sentence. The State also proffered evidence suggesting that the murder occurred while the deceased's eleven-year-old daughter was in the home. Although Appellant cites to cases in which courts have affirmed lower bail amounts, we find that the amount of the bail set in the present case is similar to that set in other first-degree felony cases. *See, e.g.*, *Ex parte Frazier*, No. 09-11-00620-CR, 2012 Tex. App. LEXIS 650, at **1-9 (Tex. App.—Beaumont Jan. 25, 2012, no pet.) (mem. op., not designated for publication) (affirming $1.9 million bail set for appellant charged with first-degree felony offense of aggravated robbery); *Ex parte Overstreet*, No. 2-08-404-CR, 2009 Tex. App. LEXIS 5724, at **11-12 (Tex. App.—Fort Worth July 23, 2009, no pet.) (mem. op., not designated for publication) (upholding a $500,000 bond for a

defendant accused of sexually assaulting and murdering his wife); *Milner v. State*, 263 S.W.3d 146, 147, 149, 151 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (affirming a $500,000 bond for a defendant accused of murdering his wife in front of their children); *Ex parte White*, No. 01-02-00480-CR, 2002 Tex. App. LEXIS 6110, at *1 (Tex. App.—Houston [1st Dist.] Aug. 22, 2002, no pet.) (mem. op., not designated for publication) (defendant charged with murdering his wife failed to prove that $475,000 bail was excessive); *Ex parte Wilson*, No. 01-00-00140-CR, 2000 Tex. App. LEXIS 4660, at **1-7 (Tex. App.—Houston [1st Dist.] July 12, 2000, no pet.) (not designated for publication) (holding that bail of $500,000 in murder case was not excessive even though defendant lacked a criminal record, willingly surrendered to police when being arrested, posed no threat to the community, and was willing to wear a monitoring device).

The ability of an accused to post bail is also a factor to be considered, but the inability to make the bail set by the trial court does not automatically render the bail excessive. *See Ex parte Vance*, 608 S.W.2d 681, 683 (Tex. Crim. App. [Panel Op.] 1980); *Golden v. State*, 288 S.W.3d 516, 519 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). For a defendant to show that he is unable to make bail, he must generally show that his funds and his family's funds have been exhausted. *Ex parte Willman*, 695 S.W.2d 752, 754 (Tex. App.—Houston [1st Dist.] 1985, no pet.) (citing *Ex parte*

13

*Dueitt*, 529 S.W.2d 531, 532 (Tex. Crim. App. 1975)). Unless a defendant has shown that his funds have been exhausted, he must usually show that he made an unsuccessful effort to furnish bail before bail can be determined excessive. *Id.*

Here, Leos-Trejo testified that he had purchased a house valued at over $200,000, and the home included TVs, a pool table, and an in-ground pool. He also agreed that he and his wife had made numerous domestic and international trips in recent years. He further testified that some of his relatives owned businesses. The trial court explained, and we agree, that Leos-Trejo had not shown that he had made unsuccessful efforts to furnish bail or that his funds had been exhausted. *See Willman*, 695 S.W.2d at 754.

As noted previously, a trial court may also consider the defendant's work history, prior criminal record, his family and community ties, length of residency, aggravating factors in the offense, and previous and outstanding bail. *See Ex parte Rubac*, 611 S.W.2d at 849. The testimony at the hearing reflects that Leos-Trejo has lived in the United States for about nine years; he has no relatives in Montgomery County, but he has relatives elsewhere in Texas and in Mexico; the nature of his work requires him to travel outside of the immediate area and sometimes out of state; and he and his wife made numerous trips out of state and out of the country. The testimony also reflected that Leos-Trejo had no previous criminal history.

14

Leos-Trejo bears the burden of demonstrating that the amount of the bond is excessive. *See id.*; *Ex parte Rodriguez*, 595 S.W.2d at 550. We conclude that Leos-Trejo failed to meet his burden. Based on the evidence before the trial court in this case, the trial court reasonably could have concluded that the bond set was justified by the nature of the offense, the potentially lengthy sentence, and Leos-Trejo's lack of strong ties to the community. *See Ex parte Rubac*, 611 S.W.2d at 849. The evidence also does not support a conclusion that Leos-Trejo had exhausted his funds in an effort to furnish bail. *See Willman*, 695 S.W.2d at 754. We cannot say that the trial court's setting of Leos-Trejo's bond at $500,000 was outside the zone of reasonable disagreement. Accordingly, the trial court did not abuse its discretion. We overrule Leos-Trejo's issue on appeal and affirm the trial court's order.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 27, 2018
Opinion Delivered July 25, 2018
Do Not Publish

Before Kreger, Horton, and Johnson, JJ.

15