**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00065-CR**
_____

**OSCAR VALENCIA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause No. 20-11-14108-CR**

**MEMORANDUM OPINION**

Appellant Oscar Valencia appeals the trial court's denial of his pretrial habeas corpus application requesting that his bail be reduced from $500,000 to $200,000. We affirm.

## Background

A grand jury indicted Valencia with the first-degree murder of Eliseo Garza.[1] The indictment alleged that Valencia "intentionally or knowingly caused the death of an individual, namely: Eliseo Garza, by shooting Eliseo Garza with a firearm[]" on or about November 16, 2020. *See* Tex. Penal Code Ann. § 19.02(b)(1), (c). According to Valencia, on November 17, 2020, Valencia's bond was initially set at $100,000 with no contact conditions for Valencia's wife and children, and the following day the trial court signed an order increasing Valencia's bond to $500,000.

Valencia filed an Application for Writ of Habeas Corpus Seeking Bail Reduction and argued the following:

> [] Valencia's confinement and restraint is illegal because the bond [amount] is excessive, oppressive[,] and beyond the financial means of [] Valencia, in violation of the Eighth and Fourteenth Amendments to the United States Constitution, Article I, §§ 11, 13, and 19 of the Texas Constitution, and Articles 1[.]07, 1.09, 11.24, and 17.15 of the Texas Code of Criminal Procedure, and various case law standing for the proposition that confining an individual based on his or her inability to pay a monetary value beyond their financial means without meaningful consideration of other possible alternatives, is inherently unconstitutional.

Valencia specifically argued that the amount of the bond is "an instrument of oppression[,]" "far exceeds" the amount necessary to ensure his appearance at future court proceedings and is "far higher than that normally required of similarly-situated

---

[1] It is alleged that Eliseo Garza was having an affair with Valencia's wife.

2

defendants." According to Valencia, neither he nor his family can pay the $500,000 bond, and he has strong ties to the community and no criminal history. Valencia also argued he is not a flight risk because he surrendered his passport to the District Attorney, he has no significant ties to any other country, and he owns a house with a mortgage in Houston.

On February 22, 2021, the trial court held a hearing on the writ via Zoom, heard testimony from Valencia's sister, took judicial notice of the court's file, and stated the following reason for denying the reduction of Valencia's bond:

> My biggest concern in this case was the very public nature and the fact that the circumstances of this offense endangered the public significantly. You know, it was an altercation in public in a very busy part of our area and a very heavily populated part of our area. And the nature of the offense and the multiple firearms that were found, as well as the pretty clear indication that this was -- or in the probable cause that this was a premeditated circumstance. I just do not believe it is in the -- that the safety and welfare of the community is protected by a bond lower than $500,000. So I'm going to leave the bond where it is.

On March 8, 2021, the trial court held a subsequent hearing via Zoom and explained that the purpose of the March 8th hearing was to allow the parties to make a record of evidence that had been presented during the earlier informal hearing. The trial court again denied the application, and Valencia appealed.

3

## Evidence at the Hearing

Testimony of Rosalva Colvin

At the first hearing, Rosalva Colvin, Appellant's sister who lives in Illinois, testified that Valencia has worked at McBride Plumbing for about eighteen years, and he supervises thirty to forty employees and has managed about fifteen sites at a time. According to Colvin, as far as she knew the job would still be available to Valencia if he were able to make bail. Colvin testified that Valencia has family in Houston and Chicago. Colvin testified that it would not be a problem that the judge had ordered that if Valencia made bail he could not go to where his wife lives because his family can secure an apartment in the Houston area where Valencia could live.

Colvin testified that Valencia is a United States citizen, has lived in the same house "pretty much the whole time[]" he has lived in Houston, has a mortgage on the house that he has always paid, and has equity in the house. According to Colvin, Valencia has three children: one about to graduate from high school, one that is almost sixteen, and a twelve-year-old that has autism. Colvin testified that she has observed Valencia to be a good father who really loves his children. Colvin testified that in Valencia's community, he coached his daughter's Little League for about three years, has attended church, and has multiple friends. Colvin testified that as far as she knows, Valencia has never been arrested other than in this case.

At the second hearing, Colvin testified that Valencia had no income and no savings at the time of the hearing. According to Colvin, the family tried to make the $500,000 bond but they were not able to do so, and the bondsmen they talked to required more assets than the family had. Colvin testified that the family could make a $200,000 bond, however.

Testimony of Detective Benjamin Nichols

At the second hearing, Detective Benjamin Nichols with the Montgomery County Sheriff's Office, who identifies and documents gang members in the Montgomery County jail, testified that in December 2020 he called Valencia after Nichols learned that Valencia's victim's father was potentially a member of the Mexican Mafia. Detective Nichols testified that he became aware that the victim in this case was a member of the "Houstone gang," and there were members of the "Houstone gang" and the Mexican Mafia gang incarcerated in the Montgomery County jail. Detective Nichols inquired as to whether Valencia felt he was in danger of retaliation and needed protective custody. According to Detective Nichols, Valencia had stated he did not need protective custody but would let jail personnel know if anything changed. Detective Nichols testified that nothing about his interaction with Valencia led him to believe that Valencia was a member of a criminal street gang or that Valencia was in any sort of danger while incarcerated at the Montgomery County jail.

<u>Testimony of Detective Sergeant Joel Gordon</u>

At the second hearing, Detective Sergeant Joel Gordon with the Shenandoah Police Department testified that he was the primary case agent investigating the case and arrived within minutes of the offense on November 16th. Detective Gordon described the scene as "chaotic" and that there was a deceased individual that had been shot and was on the ground in a grassy area just south of a throughway near City Hall and a rehab hospital. He also observed a witness "screaming and crying[,]" and two people already detained by law enforcement. Valencia was one of the detained individuals, and his wife was the witness that was screaming and crying. Four shell cases were recovered from the scene and the decedent had been shot three times. When law enforcement arrived, no firearms were located on Valencia, he had disarmed himself and his wife, and he had placed her firearm and his two firearms on the passenger seat of the vehicle at the scene after the shooting and prior to law enforcement arriving. According to Detective Gordon, Valencia did not attempt to leave the scene and complied with law enforcement at the time of his arrest.

Detective Gordon testified that through his investigation he learned that Valencia's brother-in-law, a witness in the case, was driving the vehicle Valencia was in and indicated that Valencia was using his cell phone as a tracking device and later found a tracking device on the wife's car. Detective Gordon believed that Valencia was using the tracking device to monitor and locate his wife and the

6

decedent, and this could indicate that the offense was premeditated. On cross-examination, Detective Gordon agreed that it is possible the tracking device could have been used by Valencia to prove infidelity of his spouse and not as a means for finding a location for premeditated murder. He also agreed that choosing a public location such as this one and so close to a police station as in this case without a means to escape could be a factor against a determination of premeditation. To Detective Gordon's knowledge, Valencia had no other criminal history.

According to Detective Gordon, the offense took place during the daytime in the parking lot of City Hall, where there are twenty to thirty employees typically working, and near the public works building, where five to ten employees typically worked. Detective Gordon testified that Encompass Rehab and a hospice are also in close proximity to where the offense occurred. Detective Gordon testified that "probably 100 people [were] within 100 yards of that area" at the time of the offense. Detective Gordon testified that one of the public works employees was in his vehicle on a break and taking a nap at the time of the offense and was "extremely close[]" to where the gunfire occurred, but he was not aware of any other people that observed a firearm being discharged or the vehicles pull into that area.

Review of the Trial Court's Setting of Bail

We have jurisdiction over an appeal from a trial court's merit-based denial of habeas proceedings. *See Ex parte Hargett*, 819 S.W.2d 866, 868-69 (Tex. Crim.

7

App. 1991). We review the denial of an application for writ of habeas corpus under an abuse of discretion standard. *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006); *Ex parte Klem*, 269 S.W.3d 711, 718 (Tex. App.—Beaumont 2008, pet. ref'd). We consider the entire record and review the facts in the light most favorable to the trial court's ruling. *Kniatt*, 206 S.W.3d at 664; *Klem*, 269 S.W.3d at 718. We afford almost total deference to the trial court's rulings on the application of the law to fact questions when the resolution of those questions turns on an evaluation of credibility and demeanor. *Klem*, 269 S.W.3d at 718. If the trial court's resolution of the ultimate issues turns on an application of legal standards, we review the determination de novo. *Id.*

Similarly, we review a trial court's ruling on the setting of bail under an abuse of discretion standard of review. *See* Tex. Code Crim. Proc. Ann. art. 17.15 (affording a trial court discretion to set bail); *Ex parte Rubac*, 611 S.W.2d 848, 850 (Tex. Crim. App. 1981). The trial court's ruling will not be disturbed if it is within the zone of reasonable disagreement. *Clemons v. State*, 220 S.W.3d 176, 178 (Tex. App.—Eastland 2007, no pet.) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)).

An appearance bond secures the presence of a defendant in court for trial. *Ex parte Rodriguez*, 595 S.W.2d 549, 550 (Tex. Crim. App. 1980). The United States and Texas Constitutions prohibit excessive bail. U.S. Const. amends. VIII, XIV;

8

Tex. Const. art. I, §§ 11, 13; *Ex parte Sabur-Smith*, 73 S.W.3d 436, 439 (Tex. App.—

Houston [1st Dist.] 2002, no pet.) (The right to reasonable bail is protected by the

United States and Texas Constitutions.). The trial court should set bail sufficient to

provide reasonable assurance the defendant will appear at trial, but not so high as to

be oppressive. *See* Tex. Code Crim. Proc. Ann. art. 17.15(1), (2); *Ex parte Ivey*, 594

S.W.2d 98, 99 (Tex. Crim. App. 1980). Bail is excessive if it is "set in an amount

greater than [what] is reasonably necessary to satisfy the government's legitimate

interests." *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. ref'd)

(citing *United States v. Salerno*, 481 U.S. 739, 753-54 (1987)). When setting the

amount of bail, the trial court weighs the State's interest in assuring the defendant's

appearance at trial against the defendant's presumption of innocence. *Id.* The amount

of bail may be deemed oppressive when the trial court sets the bail at an amount "for

the express purpose of forcing [a defendant] to remain incarcerated[.]" *Ex parte*

*Harris*, 733 S.W.2d 712, 714 (Tex. App.—Austin 1987, no pet.).

Analysis

In his sole issue, Appellant argues that the $500,000 bail set is unreasonable

and excessive under article I, section 11 of the Texas Constitution and article 17.15

of the Texas Code of Criminal Procedure.

To determine whether the trial court abused its discretion, we consider the

rules found in article 17.15 of the Code of Criminal Procedure as well as the factors

9

set out in *Rubac*. *See* Tex. Code Crim. Proc. Ann. art. 17.15; *Rubac*, 611 S.W.2d at 849-50. The Texas Legislature has imposed the following statutory requirements:

1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.
2. The power to require bail is not to be so used as to make it an instrument of oppression.
3. The nature of the offense and the circumstances under which it was committed are to be considered.
4. The ability to make bail is to be regarded, and proof may be taken upon this point.
5. The future safety of a victim of the alleged offense and the community shall be considered.

Tex. Code Crim. Proc. Ann. art. 17.15.

When setting the amount of bail, the trial court may also give consideration to such factors as (1) the accused's work record; (2) the accused's family and community ties; (3) the accused's length of residency; (4) the accused's prior criminal record; (5) the accused's conformity with previous bond conditions; (6) the existence of other outstanding bonds, if any; and (7) aggravating circumstances alleged to have been involved in the charged offense. *See Maldonado v. State*, 999 S.W.2d 91, 93 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (citing *Rubac*, 611 S.W.2d at 849-50).

We first note that the record contains no indication that the trial court set the amount of bail for the sole purpose of ensuring that Valencia remains incarcerated pending trial. *See Montalvo v. State*, 315 S.W.3d 588, 596 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("Our independent review of the habeas corpus record likewise

10

does not suggest that the trial court deliberately set bail at an excessively high level solely to prevent Montalvo from posting bail.").

The nature of the offense and the circumstances surrounding the offense are factors in determining what constitutes reasonable bail. Tex. Code Crim. Proc. Ann. art. 17.15(3). In considering the nature of the offense, it is proper to consider the possible punishment. *Ex parte Vasquez*, 558 S.W.2d 477, 479-80 (Tex. Crim. App. 1977). When the nature of the offense is serious and involves aggravating factors, a lengthy prison sentence following trial is probable. *Ex parte Hulin*, 31 S.W.3d 754, 760 (Tex. App.—Houston [1st Dist.] 2000, no pet.). Therefore, the pretrial bail must be set sufficiently high to secure the presence of the accused at trial because the accused's reaction to the prospect of a lengthy sentence might be to flee and fail to appear. *Id.* at 761.

In this case, Valencia was charged with first-degree murder, an offense that carries a sentence of 5 to 99 years or life and a fine not to exceed $10,000. *See* Tex. Penal Code Ann. § 12.32(a), 19.02(b)(1), (c). The State proffered evidence suggesting that the violent murder of his wife's paramour was in the presence of his wife and occurred during the day in a public area with a city employee in the near vicinity. Although Appellant cites to cases in which courts have affirmed lower bail amounts, we find that the amount of the bail set in the present case is similar to that set in other first-degree felony cases. *See, e.g.*, *Ex parte Leos-Trejo*, No. 09-18-

11

00113-CR, 2018 Tex. App. LEXIS 5655, at **1-14 (Tex. App.—Beaumont July 25, 2018, pet. ref'd) (mem. op., not designated for publication) (affirming $500,000 bail set for appellant charged with murdering his wife while the deceased's child was in the home); *Ex parte Frazier*, No. 09-11-00620-CR, 2012 Tex. App. LEXIS 650, at **1-9 (Tex. App.—Beaumont Jan. 25, 2012, no pet.) (mem. op., not designated for publication) (affirming $1.9 million bail set for appellant charged with first-degree felony offense of aggravated robbery); *Ex parte Wilson*, No. 01-00-00140-CR, 2000 Tex. App. LEXIS 4660, at **1-7 (Tex. App.—Houston [1st Dist.] July 12, 2000, no pet.) (not designated for publication) (bail of $500,000 in murder case was not excessive even though defendant lacked a criminal record, willingly surrendered to police when being arrested, posed no threat to the community, and was willing to wear a monitoring device).

The ability of an accused to post bail is also a factor to be considered, but the inability to make the bail set by the trial court does not automatically render the bail excessive. *See Ex parte Vance*, 608 S.W.2d 681, 683 (Tex. Crim. App. [Panel Op.] 1980); *Golden v. State*, 288 S.W.3d 516, 519 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). For a defendant to show that he is unable to make bail, he must generally show that his funds and his family's funds have been exhausted. *Ex parte Willman*, 695 S.W.2d 752, 754 (Tex. App.—Houston [1st Dist.] 1985, no pet.) (citing *Ex parte Dueitt*, 529 S.W.2d 531, 532 (Tex. Crim. App. 1975)). Unless a defendant has shown

12

that his funds have been exhausted, he must usually show that he made an unsuccessful effort to furnish bail before bail can be determined excessive. *Id.*

Here, although Colvin, Valencia's sister, testified that their family was unsuccessful in furnishing a $500,000 bond, that the family had the ability to put Valencia up in an apartment, and that Valencia had built up equity in his house on which he had paid the mortgage for about eighteen years. Valencia did not testify at the hearing. Valencia failed to show that he had made unsuccessful efforts to furnish bail or that his funds had been exhausted. *See id.*

As noted previously, a trial court may also consider the defendant's work history, prior criminal record, his family and community ties, length of residency, aggravating factors in the offense, and previous and outstanding bail. *See Rubac*, 611 S.W.2d at 849-50. The testimony at the hearing reflects that Valencia has lived and worked in Houston for about eighteen years and has ties there, and he has relatives in Houston and Chicago. The testimony also reflects that Valencia had no previous criminal history. As for the aggravating factors in the offense, the trial court heard evidence of how Valencia placed a tracking device on his wife's vehicle, tracked her to the location of the shooting, arrived armed with two guns, and violently shot the victim three times during the daytime, near city offices and a rehab hospital, and with a city employee in close proximity.

Valencia bears the burden of demonstrating that the amount of the bond is excessive. *See id*. at 849; *Rodriguez*, 595 S.W.2d at 550. We conclude that Valencia failed to meet his burden. Based on the evidence before the trial court in this case, the trial court reasonably could have concluded that the bond set was justified by the nature of the offense and the potentially lengthy sentence. *See Rubac*, 611 S.W.2d at 849-50. The evidence also does not support a conclusion that Valencia had exhausted his funds in an effort to furnish bail. *See Willman*, 695 S.W.2d at 754. We cannot say that the trial court's setting of Valencia's bond at $500,000 was outside the zone of reasonable disagreement. Accordingly, the trial court did not abuse its discretion. We overrule Valencia's issue on appeal and affirm the trial court's order.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on July 22, 2021
Opinion Delivered November 24, 2021
Do Not Publish

Before Golemon, C.J., Kreger and Johnson, JJ.